22CA0130 Peo v Lewis 11-07-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0130
Adams County District Court No. 16CR265
Honorable Donald S. Quick, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Mark Antonio Lewis,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE SULLIVAN
J. Jones and Lipinsky, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 7, 2024

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver,
Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emily Hessler, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Mark Antonio Lewis, appeals the judgment of

conviction entered on a jury verdict finding him guilty of second

degree murder.  We affirm.[1]

I.     Background

¶ 2     A grand jury indicted Lewis in January 2016 for the murder of

Forest Paskins (the victim).  A jury subsequently found him guilty of

first degree murder.  But a division of this court reversed his

conviction and remanded the case for a new trial, concluding that

the district court erred by instructing the jury on the initial

aggressor exception to self-defense.  *People v. Lewis*, (Colo. App. No.

---

[1] Before we start, we note that in the second amended opening
brief, Lewis's counsel altered the formatting of citations to the
record by removing spaces, even after being granted leave to file an
oversized 14,000-word opening brief.  For example, the first
transcript citation in the second amended opening brief appears as
"TR 12/9/16, p.2-3," rather than as "TR 12/9/16, p. 2-3,"
artificially lowering the citation's word count from four words to
three.  The combined effect of these alterations caused the actual
word count in Lewis's brief to exceed the 14,000-word limit that this
court authorized.  Counsel's alterations continued in the reply brief
but notably didn't appear in Lewis's initial opening brief or the first
amended opening brief, both of which the court struck for
exceeding the word limit.  Counsel's conduct violates C.A.R. 28(e)
and the Court of Appeals Policy on Citation to the Record,
https://perma.cc/NU53-ZBFQ.  We explicitly disapprove of this
practice and expect that it will not happen again.

17CA0219, May 21, 2020) (not published pursuant to C.A.R. 35(e)) (*Lewis I*).

¶ 3    On retrial, Lewis testified in his own defense, asserting that he had acted in self-defense.  The jury heard evidence from which it could reasonably find the following facts.

¶ 4    In May 2015, Lewis moved into the home of his then girlfriend, Zackeia White, where White's children and mother also lived.  The victim lived in the house's basement and was a longtime friend of White's mother.

¶ 5    On September 5, 2015, after Lewis and White returned from an evening out, White's mother told them that the victim had either "beat her up or pushed her."  White and her mother went to the basement and argued with the victim.  Lewis stepped down two stairs from the kitchen onto a landing that led to the basement and called out for White (a door to the back patio also opens into the landing).  After White climbed the stairs and walked past Lewis, the victim walked up the stairs and began arguing with him.  Lewis told the victim to "chill the fuck out."  The victim responded that the argument had nothing to do with Lewis.  Lewis then noticed a box

cutter in the victim's hand, prompting him to step back into the kitchen to retrieve a knife from the counter.

¶ 6    After additional verbal exchanges, the victim appeared to be leaving through the backdoor next to the landing. The victim reversed course, however, and charged at Lewis by grabbing his throat with both hands. In response, Lewis swung the knife at the victim, killing him. Afterwards, Lewis pulled the victim's body out of the house to the back patio. Lewis and White wrapped the victim in a tablecloth and transported his body in White's van to a grassy area near a creek, where they hid the victim's body. A couple walking their dog later discovered it.

¶ 7    The police arrested Lewis a few days later on charges unrelated to this case. While in jail, Lewis disclosed to another inmate his and White's involvement in the victim's death. The police eventually suspected Lewis's involvement in the victim's death and attempted to question him. Lewis invoked his constitutional right against self-incrimination, declined to answer the police officers' questions, and requested an attorney.

¶ 8    At the conclusion of the retrial, the jury found Lewis guilty of second degree murder.

¶ 9    Lewis now appeals.  He contends that (1) the court committed multiple errors when instructing the jury; (2) the court erred by admitting improper expert testimony under the guise of lay testimony; (3) the prosecutor committed misconduct during opening statement, closing argument, and while cross-examining Lewis; (4) the court and the prosecution erred by failing to preserve and disclose grand jury materials; and (5) the cumulative impact of multiple errors requires reversal.  We disagree with these contentions and affirm.

## II.    Jury Instructions

¶ 10    Lewis raises several contentions related to the court's jury instructions.  We address those contentions first.

### A.    Generally Applicable Standards of Review and Legal Principles Regarding Jury Instructions

¶ 11    In general, we review jury instructions de novo to determine whether the instructions as a whole accurately informed the jury of the governing law.  *People v. Theus-Roberts*, 2015 COA 32, ¶ 18.  If they do, the trial court enjoys substantial discretion in formulating the instructions and deciding whether additional instructions are required.  *Id.*  We similarly review a trial court's decision whether to

give a particular jury instruction for an abuse of discretion. *People v. Singley*, 2015 COA 78M, ¶ 40. A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or is based on a misapplication of the law. *People v. Maloy*, 2020 COA 71, ¶ 54.

¶ 12 We review preserved instructional errors for nonconstitutional harmless error, reversing only if the error substantially influenced the verdict or affected the fairness of the trial proceedings. *People v. Koper*, 2018 COA 137, ¶ 9 (citing *Hagos v. People*, 2012 CO 63, ¶ 12). But we review unpreserved claims of error for plain error. *People v. Miller*, 113 P.3d 743, 749-50 (Colo. 2005). Plain error is error that is obvious and substantial. *Hagos*, ¶ 14. An error is "obvious" if the challenged action contravened a clear statutory command, a well-settled legal principle, or Colorado case law. *People v. Thompson*, 2018 COA 83, ¶ 34, *aff'd*, 2020 CO 72. An error is "substantial" if it so undermined the fundamental fairness of the trial itself as to cast doubt on the reliability of the judgment of conviction. *People v. Sloan*, 2024 COA 52M, ¶ 36. To constitute plain error in the context of jury instructions, the defendant must also show that the record reveals a reasonable possibility that the

instructional error contributed to the conviction. *Miller*, 113 P.3d at 750.

### B. Heat of Passion

¶ 13 Lewis contends that the court erred by refusing to provide the jury with a heat of passion instruction, which could have mitigated his culpability. We disagree.

### 1. Additional Background

¶ 14 Lewis testified that, after verbally arguing with the victim and asking the victim to leave the house, the victim brandished a box cutter. In response, Lewis stepped into the kitchen; procured a knife; looked at the victim; and said, "[I]f you come at me with that [box cutter], I'll kill your ass. Don't do that." Although Lewis said he didn't recall what he did with his knife at that point, he testified that he "kept it close."

¶ 15 Lewis told the jury that, after he warned the victim, it appeared the victim was leaving the house through the door next to the landing when the victim turned around and started strangling Lewis. According to Lewis, the victim told him, "[F]uck you, you leave," and "I'll kill you" while strangling him. Lewis tried to back up, throw punches at the victim, and get the victim to "chill" out.

Lewis testified that he then swung the knife at the victim "once or twice," causing the victim to fall. Lewis said he felt fear because he "could've possibly died" from the strangulation.

¶ 16    The court rejected Lewis's requested heat of passion instruction, concluding that the victim's strangulation of Lewis warranted a self-defense instruction but that it didn't constitute the type of highly provoking act that would trigger a sudden heat of passion.[2]

2.    Standard of Review and Applicable Law

¶ 17    We review de novo whether sufficient evidence exists to support a requested jury instruction, reviewing the evidence in the light most favorable to giving the instruction. *Castillo v. People*, 2018 CO 62, ¶ 32; *People v. Silva*, 987 P.2d 909, 914 (Colo. App. 1999).

¶ 18    Second degree murder is normally a class 2 felony, but is reduced to a class 3 felony if performed under heat of passion.

---

[2] Lewis points out that the court at his first trial instructed the jury on heat of passion. But we're not reviewing the evidence or the court's instructions in that trial. Instead, we must determine whether the evidence at his *second* trial supported giving his requested heat of passion instruction.

§ 18-3-103(3)(a)-(b), C.R.S. 2024. Heat of passion requires four elements: (1) the act causing the death was performed upon a sudden heat of passion; (2) the offense was caused by a serious and highly provoking act of the intended victim; (3) the provoking act was sufficient to excite an irresistible passion in a reasonable person; and (4) between the provocation and the killing, an insufficient interval of time passed for "the voice of reason and humanity to be heard." § 18-3-103(3)(b); *People v. Garcia*, 826 P.2d 1259, 1262 (Colo. 1992). A "sudden heat of passion" under the first element is tantamount to "a sudden, unanticipated loss of self-control in response to the victim's provocation." *People v. Sepulveda*, 65 P.3d 1002, 1007 (Colo. 2003).

¶ 19    As the gatekeeper of evidence warranting jury instructions, the trial court doesn't err by rejecting a proposed heat of passion instruction if "the theory is not grounded in and supported by the evidence." *People v. Dooley*, 944 P.2d 590, 596 (Colo. App. 1997).

### 3.    Analysis

¶ 20    We conclude that Lewis didn't present evidence on the first required element. At the outset, to the extent Lewis argues that his heated verbal exchange with the victim justified his requested

8

instruction, words alone rarely rise to the level of provocation required for a heat of passion instruction. *See United States v. Frady*, 456 U.S. 152, 174 (1982) (Approving an instruction saying, "Mere words . . . no matter how insulting, offensive or abusive, are not adequate to induce [sic] a homicide although committed in passion, provoked . . . from murder to manslaughter.") (alteration in original); *People v. Ramirez*, 56 P.3d 89, 94-95 (Colo. 2002) (holding refusal of marriage proposal and demand to leave the home weren't sufficiently provocative to justify a heat of passion instruction).

¶ 21    Even when the victim's actions are added to the mix, the evidence didn't reveal "a sudden, unanticipated loss of self-control" by Lewis in response to the victim's provocation. *Sepulveda*, 65 P.3d at 1007. Lewis testified that he initially grabbed the knife to pressure the victim to put the box cutter down, and after securing the knife, he warned the victim by saying, "[I]f you come at me with that [box cutter], I'll kill your ass." This statement shows that Lewis understood that the victim presented a potential danger and that he was prepared to take defensive action. According to Lewis, when the victim attacked him by strangling him, Lewis carried out his warning. Specifically, Lewis killed the victim with the knife he had

9

*already* picked up and kept close by, anticipating that he may need to use it in defense. While this evidence may well have supported a self-defense instruction (which the court gave), it didn't reflect an "unanticipated" loss of self-control that would support a heat of passion instruction. *See id.*

¶ 22    Accordingly, we perceive no error in the court's decision declining to provide a heat of passion instruction.

### C.    Use of Force Against Intruders

¶ 23    Lewis contends that the court erred by failing to instruct the jury on the defense of use of force against intruders under section 18-1-704.5(2), C.R.S. 2024. Lewis argues that, because he requested and received this instruction during his first trial, the court should have also instructed the jury on the defense at his second trial, even absent his request. We perceive no error.

### 1.    Standard of Review and Applicable Law

¶ 24    As indicated, we review jury instructions de novo to determine whether the instructions as a whole accurately informed the jury of the governing law. *Theus-Roberts*, ¶ 18. However, a "court's general duty to instruct does not extend to crafting theory of the case instructions when defense counsel fails to do so." *People v.*

10

*Wade*, 2024 COA 13, ¶ 11. The court needs to instruct the jury on an affirmative defense "only if some evidence presented at trial supports it *and the defendant requests it.*" *People v. Lee*, 30 P.3d 686, 689 (Colo. App. 2000) (emphasis added); *see also People v. Speer*, 255 P.3d 1115, 1119 (Colo. 2011) ("[A] trial court is obliged to instruct the jury on a *requested* affirmative defense if there is any credible evidence . . . supporting it.") (emphasis added).

¶ 25 Lewis cites no authority, and we've located none, for the proposition that his counsel's request during his first trial for an instruction on the defense of use of force against intruders was adequate to preserve the issue for appellate review of his second trial. We're tasked with reviewing the evidence in *this* trial, not the evidence introduced at Lewis's first trial, to determine whether the court should have given the instruction that Lewis now claims was required. Accordingly, we review for plain error. *See Wade*, ¶ 12.

¶ 26 Under section 18-1-704.5(2), an occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against an intruder if (1) the intruder unlawfully enters the occupant's dwelling; (2) the occupant reasonably believes that the intruder has committed, is committing, or intends to

11

commit a crime in the dwelling (in addition to the unlawful entry); and (3) the occupant reasonably believes that the intruder might use physical force, however slight, against any occupant of the dwelling. *See People v. Wood*, 230 P.3d 1223, 1225 (Colo. App. 2009), *aff'd*, 255 P.3d 1136 (Colo. 2011). This statute is commonly known as the "make-my-day" statute. *Id.*

### 2. Analysis

¶ 27    For two reasons, we perceive no error, plain or otherwise.

¶ 28    First, defense counsel's decision to refrain from requesting an instruction on the make-my-day defense appears to have been a tactical one. *See Wade*, ¶ 16 ("When the defense makes a tactical decision not to submit an alternative defense instruction, a trial court's failure to sua sponte offer the instruction does not constitute error, much less plain error."); *cf. Arko v. People*, 183 P.3d 555, 558 (Colo. 2008) ("[T]he decision to request a lesser offense instruction is strategic and tactical in nature, and is therefore reserved for defense counsel."). Lewis's counsel asserted a self-defense theory at trial and didn't make any argument relating to the make-my-day statute. We note that one of Lewis's attorneys also defended him during his first trial. And as indicated, at Lewis's

first trial, defense counsel requested and received a make-my-day instruction, which the jury rejected. So Lewis's counsel knew that Lewis could assert a make-my-day defense, albeit a tenuous one as shown by the jury's verdict in the first trial.

¶ 29 Second, even if counsel's decision wasn't tactical, the evidence didn't suggest that the victim entered White's home unlawfully, as required by the first element of the make-my-day statute. *See* § 18-1-704.5(2). Even when viewing the evidence in the light most favorable to giving the instruction, *see Silva*, 987 P.2d at 914, Lewis himself testified that the victim lived at White's home. White similarly testified that the victim had lived in her home for "a couple of years." Thus, the victim wasn't an intruder for purposes of the make-my-day statute.

¶ 30 We aren't persuaded otherwise by Lewis's assertion that White demanded that the victim "just leave" during their argument. Lewis cites no authority indicating that one resident's demand for another resident to leave their shared home during an argument renders the latter an intruder for purposes of the make-my-day statute when that resident later reenters the home.

### D. Judicial Notice of Strangulation

¶ 31    Lewis contends that the court erred by refusing to take judicial notice that strangulation constitutes second degree assault and by failing to give a corresponding instruction to the jury. We conclude that Lewis invited the error, if any.

### 1. Additional Background

¶ 32    On the fifth day of trial, Lewis's counsel said that she anticipated asking the court "to take judicial notice of second-degree assault as an act of strangulation" to apprise the jury that strangulation "is an illegal act in Colorado" that is considered second degree assault. *See* § 18-3-203(1)(i), C.R.S. 2024 (A person commits second degree assault if, "[w]ith the intent to cause bodily injury, he or she applies sufficient pressure to impede or restrict the breathing or circulation of the blood of another person by applying such pressure to the neck or by blocking the nose or mouth of the other person and thereby causes bodily injury.").

¶ 33    Lewis's counsel explained that her request hinged on whether the prosecution intended to argue that strangulation doesn't rise to an assault that warrants "potentially lethal self-defense," saying, "[I]f the [prosecution] doesn't plan to argue that strangulation is not

a serious assault that someone could and should defend themselves against, then I don't think we need to take judicial notice of that." The court reserved ruling on Lewis's counsel's request, stating that judicial notice regarding strangulation wasn't "pertinent or relevant at this point."

¶ 34    Lewis's counsel never renewed her request for judicial notice, the prosecution never argued that strangulation doesn't constitute a serious assault that might warrant self-defense, and the court never took judicial notice that strangulation constitutes second degree assault or instructed the jury on this point.

2.    Standard of Review and Applicable Law

¶ 35    We review a ruling granting or denying a request for judicial notice for an abuse of discretion. *See People v. Marsh*, 396 P.3d 1, 20-21 (Colo. App. 2011), *aff'd*, 2017 CO 10M.

¶ 36    Colorado's self-defense statute provides that "a person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose." § 18-1-704(1), C.R.S.

15

2024. The statute goes on to describe when deadly physical force may be used in self-defense, stating that "[d]eadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate," and the "actor has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury." § 18-1-704(2)(a).

¶ 37　Under CRE 201(a), a court may take judicial notice of "adjudicative facts." "[A]djudicative facts" are "generally the facts of the particular case, as distinguished from, among others, facts with relevance to legal reasoning and the lawmaking process." *Doyle v. People*, 2015 CO 10, ¶ 9.

¶ 38　"The doctrine of invited error prevents a party from complaining on appeal of an error that he or she has invited or injected into the case; the party must abide the consequences of his or her acts." *People v. Rediger*, 2018 CO 32, ¶ 34. The doctrine applies to errors in trial strategy but not to errors that result from oversight. *Id.*

### 3.    Analysis

¶ 39    We first conclude that Lewis invited any error that may have resulted from the court's failure to take judicial notice that strangulation constitutes second degree assault.  Lewis's counsel made clear that her request for judicial notice was contingent on the prosecution arguing that strangulation isn't a serious assault that can justify self-defense.  Because the contingency underlying Lewis's counsel's request never occurred, the court in essence agreed with Lewis's counsel that judicial notice wasn't necessary.  Thus, Lewis invited any error in the court's decision.  *See Rediger*, ¶ 34.

¶ 40    Even if we assume that Lewis's counsel's contingent request was the result of oversight rather than trial strategy, her request for judicial notice that strangulation constitutes second degree assault wasn't a judicially noticeable "adjudicative fact[]" under CRE 201(a).  Rather, it constituted a request that the court take judicial notice of the law.  Because requests for judicial notice apply only to adjudicative facts, the court didn't abuse its discretion by reserving ruling on Lewis's counsel's contingent request for judicial notice.  *See Doyle*, ¶ 9.

17

### E.  Hands as Deadly Weapons

¶ 41  Lewis contends that the court erred by refusing to instruct the jury that hands can constitute deadly weapons.  We aren't persuaded.

#### 1.  Additional Background

¶ 42  Lewis's counsel requested that the court provide a definition of "deadly weapon" in the jury instructions and that it specifically mention that hands can constitute deadly weapons.  Lewis's counsel said he wanted to "educat[e] the jury" that "hands can be deadly weapons in Colorado."

¶ 43  The court denied Lewis's counsel's request, noting that the jury instructions on self-defense didn't contain the term "deadly weapon."  The court said it had "no problem," however, with Lewis's counsel arguing in closing that hands can constitute deadly weapons.

#### 2.  Standard of Review and Applicable Law

¶ 44  As noted, we review a trial court's decision to deny a request for a jury instruction for an abuse of discretion.  *Singley*, ¶ 40.

¶ 45  A trial court may properly reject a requested instruction that would inject "an extraneous element" into the jury's deliberations

18

and likely confuse the jury. *People v. Lybarger*, 700 P.2d 910, 916 (Colo. 1985); *see also People v. Lucero*, 985 P.2d 87, 92 (Colo. App. 1999) (instructions that are either irrelevant, misleading, or confusing to the jury must be avoided).

### 3.  Analysis

¶ 46  The court's jury instructions didn't contain the term "deadly weapon."  And while we recognize that hands and other body parts can constitute deadly weapons, *see People v. Saleh*, 45 P.3d 1272, 1275 (Colo. 2002), we perceive no abuse of discretion in the court's decision declining to provide a definition for a term that didn't appear in the jury instructions.  Doing so would have injected "an extraneous element" into the jury's deliberations and could have led to jury confusion.  *Lybarger*, 700 P.2d at 916.

¶ 47  We also disagree with Lewis's suggestion that the division's holding in *Toler* should be read as *requiring* the court to define hands as "deadly weapons" whenever hands are used to cause death or serious injury.  *See People v. Toler*, 981 P.2d 1096, 1099 (Colo. App. 1998), *aff'd*, 9 P.3d 341 (Colo. 2000).  In *Toler*, after reversing the defendant's conviction on a separate issue, the division noted that "the supreme court has recognized that fists can

be deadly weapons if, in the manner they are used or intended to be used, they are capable of producing death or serious bodily injury." *Id.* The division then said that the trial court should instruct the jury "accordingly" on remand if the defendant "so requests." *Id.* But *Toler* is unclear regarding whether the instructions in that case contained the term "deadly weapon."[3] Regardless, we don't interpret *Toler* as requiring the court to instruct the jury that hands can constitute "deadly weapons" where, as here, none of the instructions used that term.

### F. Self-Defense in Response to Burglary or Assault

¶ 48 Lewis contends that the court erred by failing to instruct the jury that a person is authorized to use deadly physical force against another in response to certain burglaries and assaults. We disagree.

---

[3] The division in *People v. Toler*, 981 P.2d 1096 (Colo. App. 1998), *aff'd*, 9 P.3d 341 (Colo. 2000), relied on *People v. Ross*, 831 P.2d 1310, 1311 (Colo. 1992), which involved a defendant who was charged with "second degree assault on the elderly *with a deadly weapon.*" (Emphasis added.) By contrast, Lewis's charges that went to the jury didn't turn on whether he used a deadly weapon.

### 1. Additional Background

¶ 49    As already discussed, Lewis and White both testified that the victim lived at White's home.  Lewis's counsel didn't argue that the victim was a burglar.

¶ 50    The court instructed the jury that Lewis was authorized to use deadly physical force against the victim

> to defend himself from what he reasonably
> believed to be the use or imminent use of
> unlawful physical force by the victim, and . . .
> he reasonably believed a lesser degree of force
> was inadequate, and . . . he had a reasonable
> ground to believe, and did believe, that he or
> another person was in imminent danger of
> being killed or receiving great bodily injury.

¶ 51    Lewis's counsel didn't request that the instruction mention that deadly physical force may be used in response to a burglary or certain assaults.

### 2. Standard of Review and Applicable Law

¶ 52    Because this claim is unpreserved, our review is limited to plain error.  *See Miller*, 113 P.3d at 749-50.  An erroneous jury instruction doesn't normally constitute plain error where the issue isn't contested at trial.  *Id.* at 750.

21

¶ 53    As relevant here, section 18-1-704(2) authorizes a person to use deadly physical force against another if the person reasonably believes that a lesser degree of force is inadequate and at least one of the following circumstances exists:

> (a)    the person has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury;
>
> (b)    the other person is using or reasonably appears about to use physical force against an occupant of a dwelling or business establishment while committing or attempting to commit burglary; or
>
> (c)    the other person is committing or reasonably appears about to commit, as relevant here, first or second degree assault.

### 3.    Analysis

¶ 54    As indicated, the court only instructed the jury that deadly physical force could be used under the circumstances outlined in section 18-1-704(2)(a), and Lewis's counsel didn't request instructions regarding using deadly physical force in response to

22

either burglary under subsection (2)(b) or first or second degree assault under subsection (2)(c). *See Wade*, ¶ 11 ("A court's general duty to instruct does not extend to crafting theory of the case instructions when defense counsel fails to do so.").

¶ 55 But even if we were address the merits of Lewis's argument, we perceive no basis for reversal. As to burglary under subsection (2)(b), Lewis and White both testified that the victim lived at White's home, allowing him to lawfully enter the residence. Thus, for the same reason that the evidence didn't support an instruction under the make-my-day statute, the evidence didn't support a deadly force instruction under subsection (2)(b), even when viewing the evidence in the light most favorable to giving the instruction. *See Silva*, 987 P.2d at 914; *see also* § 18-4-203(1), C.R.S. 2024 (A person commits second degree burglary "if the person knowingly breaks an entrance into, enters unlawfully in, or remains unlawfully after a lawful or unlawful entry in" a building.).

¶ 56 As for assault under subsection (2)(c), we conclude that any error in omitting the instructional language wasn't obvious and substantial, for two reasons. First, while some evidence may have indicated that Lewis used deadly force in response to an assault by

the victim, Lewis's consistent theory of defense at trial was that he reasonably believed that the victim would kill him if he didn't respond with deadly force in self-defense. In closing argument, for example, Lewis's counsel repeated variations of the phrase, "How do I save my life?" when describing Lewis's thought process while being strangled. Lewis's counsel also reiterated that Lewis wielded the knife to "protect himself before he died" and that Lewis held a "reasonable fear of dying," defending himself as he was "about to die." In opening statement, too, Lewis's counsel explained that Lewis believed, "If I don't do something, I'll die," and that the victim forced him "to take very extreme measures to save his own life." And as mentioned above, Lewis testified that he feared for his life.

¶ 57 Because Lewis's theory of defense wasn't that the victim merely assaulted him, this issue wasn't contested by the parties. *See Miller*, 113 P.3d at 750. And given that Lewis's counsel's arguments focused on the possibility that Lewis might die rather than suffer an assault, we perceive no reasonable possibility that the court's omission of instructional language that tracked subsection (2)(c) contributed to his conviction. *See, e.g., Hoggard v. People*, 2020 CO 54, ¶ 19 (finding no reasonable possibility that

instructional error regarding intent contributed to defendant's conviction where defendant argued only about identity).

¶ 58 Second, the logic of Lewis's argument would require that, whenever a defendant is entitled to an instruction under subsection (2)(a) concerning whether they reasonably believed that they were in imminent danger of being killed by, or receiving great bodily injury from, another person, the court must also give an instruction with the requested assault language under subsection (2)(c). Lewis points us to no authority from the supreme court or this court construing the self-defense statute in this manner.

## G. Great Bodily Injury

¶ 59 Lewis contends that the court erred by failing to give the jury an instruction defining "great bodily injury," a term used in the instruction identifying when a person is authorized to use deadly physical force in self-defense. Lewis argues that, although the court defined "serious bodily injury," the difference between the two terms likely confused the jury. We perceive no plain error.

### 1. Additional Facts

¶ 60 The court instructed the jury on the use of deadly physical force, generally tracking section 18-1-704(2)(a), including its use of

"great bodily injury."  The court also instructed the jury on the use of lesser "physical force" in self-defense, consistent with section 18-1-704(1).  The court's instruction said that the use of lesser "physical force" in self-defense is a defense to both first and second degree murder.  Consistent with the statutory language, the court's instruction on the use of lesser "physical force" didn't use the term "great bodily injury."

¶ 61    In addition, the court defined "serious bodily injury" for the jury as

> bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or breaks, fractures, or burns of the second or third degree.

¶ 62    The court, however, didn't give the jury an instruction defining "great bodily injury."

### 2.    Standard of Review and Applicable Law

¶ 63    Lewis's counsel didn't raise this argument in the district court, limiting our review to plain error.  *See Miller*, 113 P.3d at 749-50.

¶ 64     As discussed, section 18-1-704(2)(a) authorizes a person to use deadly physical force in self-defense when they reasonably believe a lesser degree of force is inadequate, and the person "has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving *great bodily injury*."[4]  (Emphasis added.)  Similarly, as relevant here, a person is justified in using lesser "physical force" upon another to defend against what the person "reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose."  § 18-1-704(1).

### 3.     Analysis

¶ 65     Even assuming that the court erred by failing to define "great bodily injury," we discern no plain error.

¶ 66     The jury found Lewis guilty of second degree murder.  Thus, at least as it pertains to second degree murder, the jury rejected both of Lewis's self-defense theories: (1) that he was justified in using

---

[4] A division of this court has concluded that "great" and "serious" bodily injury are synonymous.  *People v. Reed*, 695 P.2d 806, 808 (Colo. App. 1984).

"deadly physical force" and (2) that he was justified in using lesser "physical force." By rejecting his lesser "physical force" theory, we know that the jury also necessarily determined that Lewis wasn't justified under the circumstances in using deadly physical force on the victim. And because the court's instruction explaining the use of lesser "physical force" didn't mention the undefined term "great bodily injury," consistent with section 18-1-704(1), we perceive no reasonable possibility that the court's failure to define "great bodily injury" contributed to Lewis's conviction. *See Hoggard*, ¶ 19.

¶ 67 Moreover, as we've discussed, Lewis's theory of defense didn't rely on the degree or severity of bodily injury that he believed the victim might inflict on him. Instead, Lewis repeatedly argued that he reasonably believed that the victim would kill him by strangulation. For this additional reason, we perceive no reasonable possibility that the court's failure to define "great bodily injury" contributed to Lewis's conviction. *See id.*

### H. Deadly and Nondeadly Physical Force

¶ 68 Lewis contends that the court erred by instructing the jury that one of the elements of second degree murder is that the "defendant's conduct was not legally authorized by the affirmative

defenses in Instruction No. 14 [explaining the use of deadly physical force] *and* Instruction No. 15 [explaining the use of physical force]." (Emphasis added.) He argues that the jury needed to find that only one of these affirmative defenses applied, not both. We perceive no error, plain or otherwise.

### 1. Additional Background

¶ 69 Both the "deadly physical force" instruction (Instruction No. 14) and the lesser "physical force" instruction (Instruction No. 15) said that the prosecution "must disprove, beyond a reasonable doubt, at least one of the above numbered conditions" to prove that Lewis's conduct "was not legally authorized by this defense." In both instances, the "above numbered conditions" identified the elements of the affirmative defense.

¶ 70 During closing argument, the prosecutor told the jury that it needed to consider whether the People had disproved both theories of self-defense — the "deadly physical force" defense in Instruction No. 14 and the lesser "physical force" defense in Instruction No. 15.

### 2. Standard of Review and Applicable Law

¶ 71 Lewis's counsel didn't raise this argument in the district court, again limiting our review to plain error. *See Miller*, 113 P.3d at 749-

29

50.  We consider all of the instructions the court gave together to determine whether they accurately informed the jury of the law. *Theus-Roberts*, ¶ 18.

### 3.    Analysis

¶ 72    Viewing the elemental instruction for second degree murder in combination with the instructions explaining the affirmative defenses involving deadly physical force and physical force, we conclude that these instructions accurately informed the jury that it needed to find that only one — not both — of the affirmative defenses applied to find Lewis not guilty.

¶ 73    Stated another way, the instructions together accurately informed the jury that the prosecution had to disprove *both* affirmative defenses beyond a reasonable doubt.  Instruction No. 14 explained that the prosecution must disprove, beyond a reasonable doubt, at least one of the elements of the affirmative defense involving "deadly physical force" to establish that Lewis's conduct "was not legally authorized by this defense."  Instruction No. 15 said the same thing regarding the separate affirmative defense involving the use of lesser "physical force."  As a result, when reviewing the instructions as a whole, the jury would have

understood that the prosecution bore the burden to disprove at least one element of *both* affirmative defenses before the jury could convict Lewis of second degree murder. The prosecutor confirmed as much during closing argument.

¶ 74 Accordingly, we perceive no error in the court's jury instructions that require reversal.

### III.    Improper Expert Testimony

¶ 75 Lewis next contends that the court plainly erred by admitting a crime scene investigator's expert testimony under the guise of lay testimony. We perceive no plain error.

### A.    Additional Background

¶ 76 The investigator testified that he uncovered trace evidence of blood in White's van by using a chemical formula called "Bluestar," which contains the chemical "Luminol." The investigator explained that the chemicals react with blood, causing a "luminescence" or a "glow." The investigator also testified regarding blood "castoff," saying that when a "hand or weapon is flown through the air, blood is projected off of that object in a linear format across the ceiling or the wall or the floor, depending on which direction that castoff is going."

¶ 77    According to the investigator, using Bluestar, he identified traces of blood in White's house and the van used to transport the victim's body. The investigator testified on direct examination that he found blood in three locations in the house: the landing, the stairs between the landing and the kitchen, and the doorknob of the kitchen door. On cross-examination, the investigator testified that at least three places in the kitchen also showed signs of suspected blood.

¶ 78    Lewis testified that his altercation with the victim began on the landing next to the door leading to the back patio; that it continued on the stairs between the landing and the kitchen; and that he and the victim eventually ended up in the kitchen, where he stabbed the victim. Lewis described the entire area as a "small space." Lewis testified that he later "pulled" the victim's body outside to the back patio and that there was blood where Lewis "dragged him."

B.    Standard of Review and Applicable Law

¶ 79    We review a trial court's evidentiary decisions for an abuse of discretion. *Venalonzo v. People*, 2017 CO 9, ¶ 15. Lewis acknowledges that his counsel didn't object to the investigator's

alleged expert testimony, limiting our review to plain error. *See Hagos*, ¶ 18.

¶ 80 Colorado Rule of Evidence 701 governs the admission of testimony by lay witnesses. It provides as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [CRE] 702.

CRE 701.

¶ 81 Law enforcement officers regularly, and appropriately, testify under CRE 701 based on their perceptions and experiences. *People v. Stewart*, 55 P.3d 107, 123 (Colo. 2002). An officer's testimony becomes objectionable, however, when "what is essentially expert testimony is improperly admitted under the guise of lay opinions." *Id.* "[T]he critical factor in distinguishing between lay and expert testimony is the basis for the witness's opinion." *Venalonzo,* ¶ 22. That is, we "must consider whether the testimony could be based

on an ordinary person's experience or knowledge." *People v. Murphy*, 2021 CO 22, ¶ 21.

## C.    Analysis

¶ 82    As a threshold matter, we note that Lewis's argument assumes that the prosecution needed to formally offer, and the court needed formally to accept, the investigator as an expert before he provided expert testimony. (Lewis doesn't argue that the investigator lacked qualifications to testify as an expert based on his knowledge, skill, experience, training, or education, *see* CRE 702.) But our supreme court recently held that "the lack of a formal offer and acceptance of [an] expert does not necessarily render the expert's testimony inadmissible," provided that the expert's testimony meets the requirements of CRE 702 and *People v. Shreck*, 22 P.3d 68 (Colo. 2001). *People v. Martinez*, 2024 CO 69, ¶ 39.

¶ 83    Even if *Martinez* wasn't dispositive, and even if we assume that the investigator's testimony constituted improper expert testimony under the guise of lay testimony, we nonetheless discern no plain error. The investigator testified regarding the locations where he found blood using Bluestar, including the van, the house's landing, the stairs between the landing and the kitchen, the doorknob of the

kitchen door, and three places in the kitchen itself. But Lewis didn't dispute where his altercation with the victim took place or where the victim bled. Lewis testified that the altercation occurred in a small area — on the landing, the stairs leading to the kitchen, and the kitchen itself. He also testified that he dragged the victim's body from the kitchen to the back patio, which would have required pulling the body down the stairs leading away from the kitchen, over the landing, and through the door leading outside. Lewis also admitted that he transported the victim's body in White's van.

¶ 84    Given that Lewis's testimony was consistent with the locations where the investigator found blood, we can't conclude that the admission of the investigator's testimony so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of Lewis's conviction. *See, e.g.*, *People v. Rhodus*, 2012 COA 127, ¶ 39 (finding no plain error in admission of officer's expert testimony where other evidence "would have permitted the jury to reach the same conclusion"); *cf. Stewart,* 55 P.3d at 124 (officer's expert testimony admitted under the guise of lay opinion testimony was harmless where other evidence corroborated that testimony).

## IV.    Prosecutorial Misconduct

¶ 85    Lewis next contends that four instances of prosecutorial misconduct require reversal.  We aren't persuaded.

### A.    Standard of Review and Applicable Law

¶ 86    Lewis concedes that his claims of prosecutorial misconduct are unpreserved, limiting our review to plain error.  *See People v. Nardine*, 2016 COA 85, ¶ 63.  Similar to the jury instruction context, reversal under this high standard requires that the prosecutorial misconduct be "obvious and substantial and so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction."  *Id.*  "Only prosecutorial misconduct that is 'flagrantly, glaringly, or tremendously improper' warrants reversal under the plain error test."  *People v. Duncan*, 2023 COA 122, ¶ 33 (quoting *Hagos*, ¶ 14).

¶ 87    We engage in a two-step analysis when reviewing claims of prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances.  *Id.* Second, we decide whether any improper conduct in this case warrants reversal under the proper standard of review.  *Id.*

¶ 88    Three of Lewis's contentions of prosecutorial misconduct involve the prosecutor's closing argument. When evaluating a prosecutorial misconduct claim relating to closing argument, we look to the "context of the argument as a whole and in light of the evidence before the jury." *People v. Geisendorfer*, 991 P.2d 308, 312 (Colo. App. 1999). A prosecutor is entitled to "employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance," *People v. Gladney*, 250 P.3d 762, 769 (Colo. App. 2010) (citation omitted), and enjoys "considerable latitude in replying to opposing counsel's arguments," *People v. Conyac*, 2014 COA 8M, ¶ 133. Because arguments delivered in "the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *People v. Samson*, 2012 COA 167, ¶ 30. "Prosecutorial misconduct in closing argument rarely constitutes plain error." *People v. Smalley*, 2015 COA 140, ¶ 37.

## B.    Post-*Miranda* Silence

¶ 89    Lewis contends that the prosecutor improperly used his post-*Miranda* silence as evidence of guilt when cross-examining him and when delivering closing argument. Specifically, Lewis asserts that

the prosecutor improperly pointed out that his trial testimony about the victim's box cutter contradicted his prior statements.

### 1. Additional Background

¶ 90    Shortly after the victim's death, Lewis made a voluntary pre-*Miranda* statement to police but didn't mention being involved in the victim's death or that the victim wielded a box cutter. A few days later, however, the police's investigation pointed to Lewis, and officers attempted to speak with him a second time. After police gave Lewis a *Miranda* warning, Lewis declined to make any statements and requested a lawyer. While in jail and awaiting trial, Lewis told a fellow inmate that the victim "went missing" after he "lunged" at Lewis but didn't mention that the victim brandished a box cutter.

¶ 91    At trial, Lewis's version of the events shifted. He testified on direct examination that he noticed the victim holding a box cutter near the beginning of their altercation. On cross-examination, the prosecutor asked Lewis about his conversation with the inmate, asking whether he "left out the part about [the] box cutter"? Lewis responded, "Yeah. He started asking too many questions, acting like the police." The prosecutor later returned to the box cutter

38

again, asking Lewis, "Today this version is that you saw a box cutter, right?" Lewis responded, "That's what I told the jury." The prosecutor also asked Lewis whether this was the "first time anybody's heard" that the victim "came at you with a knife."

¶ 92 During closing argument, the prosecutor pointed out that Lewis's trial testimony differed from his prior statements. The prosecutor argued that "nobody until the defendant [got] on the stand has ever heard" of the victim wielding a box cutter. He also asked the jurors to "[c]onsider the fact that the near death fantastic story that you heard today [wa]s the first time in six years that that story's been told," and he asked rhetorically, "Why . . . for the first time are we hearing about a box cutter and some sort of a standoff with the knives?"

## 2. Analysis

¶ 93 Lewis's argument fails under *Wend*'s first step. Lewis voluntarily testified about the box cutter and spoke to a fellow inmate about his altercation with the victim. The prosecutor was therefore permitted to cross-examine Lewis about the box cutter and explore any inconsistencies or omissions between Lewis's testimony and his prior statements. *See People v. Rogers*, 68 P.3d

486, 492 (Colo. App. 2002) ("A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits." (quoting *United States v. Goldman*, 563 F.2d 501, 503 (1st Cir. 1977))). Similarly, because Lewis chose to testify, the prosecutor was allowed to impeach his credibility, just like that of "any other witness," *People v. Dore*, 997 P.2d 1214, 1219 (Colo. App. 1999), and comment in closing argument on "how well and in what manner [the] witness measures up to the tests of credibility," *People v. Constant*, 645 P.2d 843, 845-46 (Colo. 1982).

¶ 94    Contrary to Lewis's contention, we don't read any of the prosecutor's statements as an improper comment on Lewis's post-*Miranda* silence. Nothing in the prosecutor's statements or questions zeroed in on Lewis's choice to remain silent when police attempted to question him a second time. To the extent any of the prosecution's statements could have been interpreted as a vague reference to Lewis's post-*Miranda* silence, such statements provide no basis for reversal. *See People v. Ray*, 109 P.3d 996, 1003 (Colo. App. 2004) ("A prosecutor's ambiguous remarks not directly referring to a defendant's decision not to testify do not implicate the defendant's constitutional rights and are not grounds for reversal.").

40

## C. Misstatement of Self-Defense Law

¶ 95    Lewis contends that the prosecutor misstated the law on self-defense by recommending that the jury consider the offense elements in a particular order, with the self-defense element being considered last. Lewis argues that the prosecutor's recommendation incorrectly suggested that self-defense is a "separate legal inquiry" from the other offense elements.

### 1. Additional Background

¶ 96    In closing argument, the prosecutor recommended that the jury consider the offense elements in a particular order, saying,

> Your number one job in this case; first, is to determine that. Okay. Determine if first-degree murder was kill [sic]. Why is that your first job? Because then you have to look at, well, if he committed first-degree murder, then you have job number 2, I got to say whether or not this was justified murder. Was he justified under the principles of self-defense in killing [the victim]?
>
> My recommendation to you is to deal with that first. Decide on the elements. Do we have a killing and what level do we have, do we have a reckless manslaughter or do we have a first-degree murder? Because all three of them — once you make that decision, all three of them then have to be viewed in the lens of, well, was it justified, right. And that's what we're

looking at when we move forward to physical force.

### 2. Analysis

¶ 97    We don't agree with Lewis that the prosecutor's recommendation constituted a misstatement of the law.  Lewis cites no authority, and we've located none, prohibiting either (1) the jury from considering the offense elements in any order it chooses or (2) the parties from recommending a particular order in closing arguments.  Moreover, the court correctly instructed the jury that the prosecution had to prove all the elements of second degree murder beyond a reasonable doubt, including that Lewis's conduct wasn't legally authorized by either theory of self-defense.

### D.    Misrepresentation of "Reasonable Doubt"

¶ 98    Lewis contends that the prosecutor misstated the law by inaccurately describing the concept of reasonable doubt during closing argument, saying a doubt isn't reasonable if a juror "can't put [their] finger on" it or if a juror can't articulate the doubt "out loud in the jury room."  We agree that the prosecutor misstated the law but perceive no plain error.

### 1. Additional Background

¶ 99   During closing, the prosecutor highlighted the court's jury instruction that explained the concept of reasonable doubt, saying "[I]t tells you right in the definition of reasonable doubt. It's not vague, it's not speculative, and it's not imaginary." The prosecutor elaborated: "[S]o if you're sitting back in the jury room and you're deliberating and you say, gosh, I have a doubt but I just can't put my finger on what that doubt is, right. That's a vague doubt. That's not reasonable doubt."

¶ 100   The prosecutor then turned to the part of the court's jury instruction that stated a reasonable doubt is one that "would cause reasonable people to hesitate to act in matters of importance to themselves." The prosecutor explained that part of the instruction by saying it's "[a] doubt you can put your finger on. A doubt that you can say out loud in that jury room, this is what is making me have a reasonable doubt."

### 2. Analysis

¶ 101   We agree with Lewis that the prosecutor misstated the law by suggesting that a reasonable doubt is one that a juror must be able to articulate "out loud" or "put [their] finger on." A doubt need not

rise to an articulable one to constitute a reasonable doubt. *See People v. Sherman*, 45 P.3d 774, 777-78 (Colo. App. 2001). We further conclude that the court obviously erred by failing to correct the prosecutor's remark because Colorado case law at the time clearly established that a prosecutor misstates the law by arguing to the jury that a reasonable doubt must be articulable. *See People v. Hogan*, 114 P.3d 42, 56 (Colo. App. 2004) (citing *Sherman*, 45 P.3d at 778); *see also Thompson*, ¶ 34 (an error is obvious if it contravenes Colorado case law).

¶ 102 Nonetheless, the court's error didn't so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *See Nardine*, ¶ 63. The prosecutor's misstatements were brief and immediately preceded by accurate descriptions of reasonable doubt that tracked the pattern jury instruction. *See* COLJI-Crim. E:03 (2021); *cf. Duncan*, ¶ 37 (prosecutor's use of "what ifs" during closing argument wasn't improper, in part, because it was immediately preceded by language that tracked the pattern jury instruction for reasonable doubt).

¶ 103 The court also instructed the jury (1) regarding the correct definition of reasonable doubt and (2) that it must follow the rules

of law provided by the court, even if an attorney comments on the rules. *See Hogan,* 114 P.3d at 56. Absent evidence to the contrary, we presume that the jury followed the court's instruction. *People v. Garcia,* 2012 COA 79, ¶ 20. Finally, the lack of an objection by Lewis's counsel suggests that the live argument, despite its appearance in a cold record, wasn't overly damaging. *See Domingo-Gomez v. People,* 125 P.3d 1043, 1054 (Colo. 2005).

### E. Request that the Jury "Hold" Lewis "Accountable"

¶ 104 Lewis contends that the prosecutor committed misconduct at the conclusion of his opening statement by improperly pressuring the jury to "hold [Lewis] accountable" for the victim's murder. Just before making this statement, the prosecutor summarized the evidence that he anticipated the jury would hear regarding Lewis's words and conduct towards the victim.

¶ 105 We agree with Lewis that a prosecutor's statement asking the jury to "send a message" to the community or exhorting the jury to "do its job" is generally improper. *See, e.g., United States v. Young,* 470 U.S. 1, 18 (1985); *People v. Gallegos,* 260 P.3d 15, 28 (Colo. App. 2010). But the prosecutor here said no such thing. Instead, the prosecutor summarized the evidence against Lewis that he

anticipated the jury would hear, summing it up by asking the jury to "hold" Lewis "accountable." Based on this broader context, and after reviewing the prosecutor's opening statement as a whole, we conclude that the prosecutor's statement wasn't improper. *See, e.g., People v. Tran*, 2020 COA 99, ¶ 68 ("[T]he prosecutor's argument that the jury 'need[ed] to hold [Tran] accountable' was not improper because the prosecutor made this comment immediately after arguing that the evidence established Tran's guilt.").

¶ 106 We aren't persuaded otherwise by Lewis's argument that the division in *People v. Carian*, 2017 COA 106, warned prosecutors against asking jurors to hold defendants accountable. The *Carian* division held that the prosecutor in that case argued improperly that the jury should hold the defendant "accountable" for "squandering" and "wasting" the valuable public resources of the probation department. *Id.* at ¶¶ 57-61. The division explained that the prosecutor's comments were unrelated to the defendant's charges and diverted the jury's attention from deciding the charges based on the evidence before it. *Id.* at ¶ 57. Contrary to Lewis's argument, the division's analysis didn't turn on the phrase "hold [the defendant] accountable." *Id.*

¶ 107   Accordingly, we reject Lewis's contentions that the prosecutor committed reversible misconduct.

## V.   Grand Jury Materials

¶ 108   Lewis contends that the court and prosecution failed to preserve grand jury materials necessary for him to raise an equal protection challenge to the grand jury's selection.  He also asserts, in the alternative, that we should remand for the court either to disclose the prospective grand jurors' questionnaires and the undisclosed portions of the grand jury transcript or to make findings justifying its decision to withhold those materials.  We aren't persuaded.

### A.   Additional Background

¶ 109   Before his first trial, Lewis's counsel requested the disclosure of various grand jury materials so that they could test the legality and fairness of the grand jury proceedings that resulted in Lewis's indictment.  The court denied that request.

¶ 110   On appeal, the division in *Lewis I* determined that the court applied the wrong legal standards when denying Lewis's request for disclosure.  *Lewis I*, slip op. at ¶¶ 57-74.  The division instructed the court on remand to (1) disclose to Lewis the master jury list; (2)

either disclose the grand juror questionaries or make specific findings that nondisclosure is necessary to protect the grand jury process or the grand jurors' security; and (3) applying the same balancing test, either disclose the transcript of the grand jury proceedings or make findings that nondisclosure is necessary to protect the proceedings or the grand jurors. *Id.* at ¶¶ 58, 66, 74.

¶ 111 On remand, the court held several pretrial hearings to address Lewis's counsel's request for disclosure. The court summarized the actions it took in response to Lewis's counsel's request and the *Lewis I* division's remand instructions:

- The court provided Lewis's counsel with the master grand jury list identifying the names of the seventy-five prospective grand jurors; the information provided identified those who were selected as grand jurors and alternates, as well as those who were excused from consideration.

- The court provided information on the eleven potential jurors with Hispanic surnames, stating seven were excused by the chief judge, two served, and two weren't

selected. The seven excused by the chief judge said they didn't want to serve.

- The court disclosed information regarding the prospective grand jurors' ages, genders, and occupations. The court didn't, however, disclose the prospective grand jurors' home addresses.

- The court provided Lewis with a redacted grand juror questionnaire used during the selection process.

- The court released the portions of the grand jury transcript involving the questioning of the prospective grand jurors, which totaled eighty-six pages of the 123-page transcript.

¶ 112 The court explained that, although information about the prospective grand jurors' race wasn't collected, the transcript revealed that the chief judge who presided over the selection process said he wanted to achieve a "blend of people from Adams and Broomfield" counties and a "balance of gender and rac[e]." The court then said that the "only other" statement about race in the transcript came from the assistant district attorney, who said that "diversity is a value," and diversity of "background, experience,

49

beliefs, race, . . . [and] residences" all contribute to the grand jury's ability to hear evidence and determine whether a crime was likely committed.

¶ 113    In explaining how it balanced Lewis's need for the grand jury materials against the competing interests of the prospective grand jurors' privacy and safety, the court made the following findings:

- "[T]here w[ere] concerns about witnesses being contacted and concerns about specific witness intimidation in this case." As a result, the court ordered that only Lewis's counsel have access to the grand jury information.

- Six years had passed since the jurors were selected. Based on the jurors' privacy interests, it was inappropriate for investigators from either side to attempt to "individually contact" or "try to round up" the prospective grand jurors to ask them questions about their race.

- The court harbored concerns that an investigator from either side might form "personal opinion[s]" regarding whether a prospective grand juror was "one race or

mixed race" if they were allowed to contact individual jurors.

### B. Standard of Review and Applicable Law

¶ 114 We review a district court's decision regarding the disclosure of grand jury materials for an abuse of discretion. *See People v. Dist. Ct.*, 610 P.2d 490, 493 (Colo. 1980).

¶ 115 As the *Lewis I* division explained, Colorado rejects the idea that grand jury proceedings must be "kept secret 'for secrecy's sake.'" *Lewis I,* slip op. at ¶ 60 (quoting *Parlapiano v. Dist. Ct.*, 491 P.2d 965, 968 (Colo. 1971)). Instead, the "maintenance of the wall of secrecy around grand jury testimony should be grounded upon sound reason." *Parlapiano*, 491 P.2d at 968. At the same time, a court may "preserve the confidentiality" of grand jurors' identifying information when reasonably necessary to protect the grand jury process or the grand jurors' security. § 13-74-103, C.R.S. 2024.

¶ 116 Section 13-71-115, C.R.S. 2024, governs the information that the court must collect from prospective members of grand and petit juries on juror questionnaires. Although the statute requires that the questionnaire request many categories of information (including name, sex, date of birth, age, residence, marital status, number and

ages of children, educational level, occupation, employment status, spouse's occupation, previous juror service, and present or past involvement as a party or witness in a civil or criminal proceeding), it doesn't require that the questionnaire request information about the prospective jurors' race or ethnicity. *See id.* Upon completion of jury selection, parties and counsel must return all copies of the completed questionnaires to the court for immediate destruction. § 13-71-115(2). The court retains the original completed questionnaires in a sealed envelope in the court's file, but the originals don't constitute a public record. *Id.*

### C. Whether the Court or Prosecution Was Required to Preserve Race Information Regarding the Grand Jury Venire

¶ 117     Lewis's core contention is that the court and prosecution should have preserved records regarding the racial makeup of the grand jury venire so that he could pursue a later equal protection challenge, if necessary.

¶ 118     We disagree for the reasons explained by the division in *People v. Toro-Ospina*, 2023 COA 45, ¶¶ 31-37. The defendant in *Toro-Ospina* raised an argument almost identical to Lewis's: Knowing potential jurors' racial and ethnic information is "essential to the

invocation and assessment" of a defendant's equal protection rights, including the exercise of *Batson* challenges. *Id.* at ¶ 29. The division agreed that the defendant's argument raised an important policy question for the legislative branch but noted that this court doesn't "sit as a policy-making body." *Id.* at ¶ 37. Because the General Assembly hadn't required courts or prosecutors to collect or retain information on potential jurors' race or ethnicity, either in section 13-71-115(1) or elsewhere, the division reasoned that it couldn't substitute its policy judgment for that of the General Assembly. *Id.* As a result, the division perceived no abuse of discretion in the court's decision declining to ask potential jurors about their race or ethnicity. *Id.*

¶ 119 For the same reasons, we discern no abuse of discretion by the court or any misconduct by the prosecution. Section 13-71-115(1) doesn't require the court or prosecution to request, collect, or maintain information regarding the race of the grand jury venire members, and Lewis points us to no other authority imposing such an obligation. Absent such a requirement, we can't say that the court abused its discretion or that the prosecution engaged in misconduct.

D. Alternative Request for Remand for Specific Findings on Questionnaires and the Unredacted Transcript

¶ 120    We also reject Lewis's alternative request that we remand for the court to either (1) disclose the prospective grand jurors' completed questionnaires and the undisclosed portions of the grand jury transcript or (2) make further findings justifying its continued withholding of those materials.

¶ 121    Based on our review of the record, we conclude that the court carefully balanced the competing interests of Lewis's need for the grand jury materials against the prospective grand jurors' privacy and safety.  *See Lewis I*, slip op. at ¶¶ 59-66 (describing balancing test).  The court went to great lengths to explain that it had provided Lewis with the maximum amount of information possible without disclosing sensitive information (like home addresses) that could have enabled investigators or others to contact individual prospective grand jurors.  Given that the court found that "specific witness intimidation" remained a concern, we can't say it abused its discretion by withholding information that might have revealed where the prospective grand jurors lived.  *See* § 13-74-103 (the court may preserve the confidentiality of grand jurors' identifying

54

information when reasonably necessary to protect the grand jury process or the jurors' security); *see also People v. Rhea*, 2014 COA 60, ¶ 58 ("[U]nder the abuse of discretion standard, the test is not 'whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options.'") (citation omitted).

¶ 122     As to the transcript of the grand jury proceedings, the court released the eighty-six pages dealing with "the questioning of jurors." Those pages included what the court described as the "only" two instances where the issue of race was raised: (1) the chief judge's statement that he wanted to achieve a "balance" of gender and race among the grand jurors; and (2) the assistant district attorney's statement that diversity, including racial diversity, is "a value."

¶ 123     The record reveals that, after receiving the partial transcript, Lewis's counsel requested and received a continuance of one of the pretrial hearings so that counsel could "go over the Grand Jury transcript." Lewis's counsel never requested additional transcript pages, nor does Lewis explain on appeal why he needed those portions that didn't relate to the prospective jurors' questioning.

*See People v. Liggett*, 2021 COA 51, ¶ 53 (we don't address undeveloped arguments), *aff'd*, 2023 CO 22.

¶ 124    Accordingly, we reject Lewis's request that we remand the case to the court for further proceedings related to the grand jury materials.

## VI.    Cumulative Error

¶ 125    Finally, Lewis contends that the cumulative impact of the court's errors requires reversal.

¶ 126    "When reviewing for cumulative error, we ask whether 'numerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial.'" *People v. Vialpando*, 2022 CO 28, ¶ 33 (quoting *Howard-Walker v. People*, 2019 CO 69, ¶ 24).  We must reverse if the cumulative effect of multiple errors and defects substantially affected the fairness of the trial proceedings and the integrity of the factfinding process.  *Howard-Walker*, ¶ 24.  "The doctrine of cumulative error requires that numerous errors be committed, not merely alleged."  *People v. Rivers*, 727 P.2d 394, 401 (Colo. App. 1986).

¶ 127 We have found one error in the prosecutor's closing argument and assumed three other possible errors for purposes of our plain error analysis, finding each nonprejudicial. We conclude that these errors, either alone or together, didn't deprive Lewis of a fair trial. *See Vialpando*, ¶¶ 40-46 (finding five errors viewed in the aggregate didn't constitute cumulative error that deprived the defendant of a fair trial).

## VII. Disposition

¶ 128 We affirm the judgment.

JUDGE J. JONES and JUDGE LIPINSKY concur.