The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Jon Courtland LYBARGER,
Defendant-Appellant.

Nos. 83SA433, 84SA236.

Supreme Court of Colorado,
En Banc.

May 20, 1985.

Rehearings Denied June 10, 1985
and June 24, 1985.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., John Daniel Dailey, First Asst. Atty. Gen., Denver, for plaintiff-appellee.

David F. Vela, Colo. State Public Defender, David Wymore, Chief Deputy Public Defender, Michael J. Heher, Deputy Public Defender, Denver, for defendant-appellant.

Dwight A. Hamilton, Jan E. Montgomery, Denver, for amicus curiae, First

Church of Christ, Scientist, in Boston, Mass.

QUINN, Justice.

In this appeal the defendant, Jon Courtland Lybarger, challenges his conviction of felony child abuse resulting in death.[1] Among his claims are the following, which we address in this opinion: that the trial court erred in declaring on its own motion that the affirmative defense of treatment through spiritual means, as provided in sections 18–6–401(6) and 19–1–114, 8 C.R.S. (1978), abridged the constitutional prohibition against legislation respecting the establishment of religion, U.S. Const. amend. I; Colo. Const. art. II, § 4; that the trial court erred in deleting the phrase "without justifiable excuse" from the elemental jury instruction on child abuse resulting in death; and that the evidence presented at trial was insufficient to support the conviction. Although we are satisfied that the elemental instruction on child abuse was not erroneous under the evidentiary record in this case and that the evidence was sufficient to withstand the defendant's motion for a judgment of acquittal, we nonetheless conclude that the trial court committed reversible error in striking on its own motion the statutory affirmative defense of treatment through spiritual means. We accordingly reverse the defendant's conviction and remand for a new trial.

I.

The defendant was charged in the District Court of Larimer County with child abuse resulting in death,[2] § 18–6–401(1)(a) and 7(a)(II), 8 C.R.S. (1984 Supp.), in that between March 13 and 15, 1982, he recklessly or with criminal negligence, and without justifiable excuse, placed his child, Jessica Ann Lybarger, in a situation that endangered the child's life or health and the death of the child resulted.[3] The defendant, prior to trial, informed the prosecution and the court that he intended to rely on the statutory affirmative defense of treatment through spiritual means as recognized by sections 18–6–401(6) and 19–1–114, 8 C.R.S. (1978). The former statute, § 18–6–401(6), which is part of the statutory proscription of child abuse, states as follows:

No child who in good faith is under treatment described in section 19–1–114,

1. Jurisdiction over this appeal lies in this court because the defendant has challenged the trial court's declaration that sections 18–6–401(6) and 19–1–114, 8 C.R.S. (1978), are facially unconstitutional. §§ 13–4–102(1)(b) and 13–4–110(1)(a), 6 C.R.S. (1973).

   The defendant, in addition to appealing his conviction in case no. 83SA433, also filed an appeal in case no. 84SA236, in which he challenges the trial court's denial of his Crim.P. 35(c) motion predicated on a claim that the child abuse sentencing scheme violates equal protection of the laws. Because we are reversing the defendant's conviction and remanding for a new trial in case no. 83SA433, it is unnecessary for us to address any of the issues raised in case no. 84SA236.

2. Child abuse resulting in the death of a child through recklessness or criminal negligence is a class 3 felony, punishable by a presumptive sentence of four to eight years plus one year of parole. §§ 18–6–401(7)(a)(II) and 18–1–105(1)(a)(I), 8 C.R.S. (1984 Supp.).

3. The information alleged that the defendant placed his child in a situation that "may endanger" the child's life or health and that the death of the child resulted. In *People v. Hoehl*, 193

Colo. 557, 568 P.2d 484 (1977), we construed the word "may" to mean a reasonable probability that the child's life or health will be endangered from the situation in which the child is placed. In *People v. Schwartz*, 678 P.2d 1000 (Colo. 1984), we held that the "may endanger" language of subsection 18–6–401(1)(b), 8 C.R.S. (1984 Supp.), is not applicable to conduct which actually results in injury or death. When the act of child abuse results in injury or death, then, as noted in *Schwartz*, the child was placed in a situation that "endangered" its life or health within the intendment of section 18–6–401(1)(a), 8 C.R.S. (1984 Supp.), and the defendant is subject to prosecution under subsection (1)(a) of section 18–6–401. While the trial of this case occurred prior to our decision in *Schwartz*, we nonetheless view the information as alleging the crime of child abuse resulting in death. If the prosecution believes a technical amendment to the information is necessary in order to conform the charge to the statutory construction adopted in *Schwartz*, it will have adequate opportunity to make an appropriate motion to amend after the case is remanded to the trial court.

C.R.S.1973, shall, for that reason alone, be considered to be abused or endangered as to his health within the purview of this section. This subsection (6) shall be an affirmative defense.

The latter section, § 19–1–114, is found in the Colorado Children's Code and provides as follows:

Notwithstanding any other provision of this title, no child who in good faith is under treatment solely by spiritual means through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall, for that reason alone, be considered to have been neglected within the purview of this title.

Although relying on these statutes as a defense to the charge, the defendant nevertheless sought a pretrial ruling that the language of section 19–1–114 limiting the prayer defense to those forms of spiritual treatment that accorded with "the tenets and practices of a recognized church or religious denomination" and that were performed by "a duly accredited practitioner thereof," if applied so as to deprive the defendant of the right to rely on treatment through prayer, would violate his First Amendment right to freely practice his religion.[4] The prosecution, on the other hand, simply contended that the statutory affirmative defense was not applicable to the facts underlying the charge.

The court, immediately prior to the commencement of trial to a jury, issued a written ruling with respect to the statutory prayer defense. After initially noting that the statutory restriction of the affirmative defense to duly accredited practitioners of a recognized church or religious denomination was a violation of equal protection

of the laws—a claim not specifically raised by the defendant—the court stated that it need not "delve into the evaluation of that particular issue" because, in its view, there was a more serious constitutional flaw in the statute. The court then proceeded on its own motion to address what it perceived as the critical issue before it. Formulating the question as whether the defendant may constitutionally raise his religious beliefs and practices as an affirmative defense to the charge of child abuse resulting in death, the court reasoned as follows:

The real and practical effect of [sections 18–6–401(6) and 19–1–114] is to recognize and give credence to a particular religion and its practice (i.e., that of healing by prayer *alone*). The First Amendment ... extends not only to establishing laws that may prohibit the conduct of a person or group but as well as to granting of [a] privilege or exemption from the application of its laws to a group for religious reasons.

\* \* \* \* \* \*

It is the duty of a parent or guardian to seek all reasonable means of treatment, and one cannot, as such, exclude medical care or treatment when that need or choice is warranted by the circumstances.... One cannot hide behind religious practices as a defense to one's alleged "child abuse resulting in death" as defined in [section 18–6–401(1)]. (emphasis in original).

The court held that the statutory affirmative defense created by sections 18–6–401(6) and 19–1–114 directly violated the constitutional prohibition against the enactment of any law respecting the establishment of religion. U.S. Const. amend. I; Colo. Const. art. II, § 4.[5] In keeping with

---

**4.** The record is silent on the reasons why the defendant believed that the limiting language of section 19–1–114, 8 C.R.S. (1978), might conceivably be applicable to him. We can only surmise that the defendant might have been concerned about whether, for purposes of section 19–1–114, his church qualified as "a recognized church or religious denomination" or whether the tenets and practices of his church included

"treatment solely by spiritual means through prayer."

**5.** The First Amendment to the United States Constitution, in addition to guaranteeing the free exercise of religion, prohibits Congress from making any law "respecting an establishment of religion." U.S. Const. amend. I. The Colorado Constitution, which also guarantees the "free exercise and enjoyment of religious

its holding, the court ruled that any evidence relating to the defendant's religious practices would not be admissible as a defense to the charge but would be admissible if otherwise relevant to other issues in the case, such as the defendant's intent in not seeking medical treatment and the daughter's need for medical treatment.

The evidence presented at trial was conflicting in several particulars, but basically established the following circumstances surrounding the death of the defendant's five week old daughter, Jessica. The defendant had no formal theological training, but served as the minister of a small fundamentalist church which met in the Estes Park area. He lived with his wife and nine children in a one-room cabin near Estes Park. During the three weeks preceding Jessica's death, nearly every member of the defendant's family experienced cold symptoms. Shortly before the weekend of March 13 and 14, 1982, the defendant became aware that Jessica was somewhat congested and was experiencing periodic coughing spells.

On Saturday, March 13, the defendant, after observing that Jessica was coughing more frequently than previously, called Carl Waldeck, an elder in the church. He asked Waldeck to pray for his child and to contact Sammie Ferdinandtsen, another church elder. Waldeck complied with the defendant's request. Both Waldeck and Ferdinandtsen, thinking that perhaps the child had been hospitalized, called the Estes Park Hospital. After learning the child had not been hospitalized, Ferdinandtsen then went to the home of Robert and Jane McGillicuddy, who lived across the street from the Estes Park Hospital. After a brief visit there, Ferdinandtsen and Robert McGillicuddy went to the defendant's home to check on the baby. Ferdinandtsen noted that Jessica had some congestion and appeared to have a cold. In McGillicuddy's view, the child not only appeared congested but was also ashen in color.

The defendant, McGillicuddy, and Ferdinandtsen prayed for the health of the child on this occasion and annointed her with oil. On the evening of March 13, after receiving an anonymous call that the defendant's child was ill, two officers of the Larimer County Sheriff's Department went to the defendant's home to check on the baby. According to the officers, the baby appeared to have a cold but her condition was not such as to warrant her removal from the home in order to obtain medical treatment. One of the officers, speaking to Ferdinandtsen outside the defendant's home, asked whether the defendant would permit the baby to be medically treated. Ferdinandtsen went inside the home and put the question to the defendant. The defendant replied, "I want the best help for my baby and God is the best help for my baby."

The next day, Sunday, the baby's condition worsened. She experienced a serious coughing spell in the afternoon and, according to the defendant, her breathing became somewhat shallow and she raised some phlegm. Because the defendant and his wife were extremely tired from the family's bout with cold symptoms during the preceding weeks, they decided to bring Jessica to the home of the McGillicuddys. The defendant believed that the baby might have an easier time breathing in that home, since the McGillicuddys did not have a wood burning stove as did the Lybargers. According to Mrs. McGillicuddy, when she viewed the baby on Sunday afternoon, Jessica was pale, "looked sick," had blue fingernails, and was just "laying there." Mr. McGillicuddy described the baby on this occasion as "[v]ery sick" and "having trouble breathing." When Mrs. McGillicuddy suggested to her husband that the child should be brought to the hospital, her husband passed on the suggestion to the defendant. The defendant replied: "We can't do that. This has been our walk. This is what we believe in. It's our life."

profession and worship," states that no preference shall be "given by law to any religious denomination or mode of worship." Colo. Const. art. II, § 4.

During the evening of March 14 the baby was too weak to nurse, so Mrs. McGillicuddy administered herbal tea and honey to the child and stayed up with her while the defendant and his wife tried to sleep. The defendant awoke at approximately 2:00 a.m. on Monday morning, March 15, and Mrs. McGillicuddy once again urged that the child be given medical treatment. The defendant disagreed and also rejected a later suggestion from Mr. McGillicuddy concerning hospitalization. When the baby's condition seemed to improve somewhat on Monday morning, the defendant went to sleep about 10:00 a.m., thinking that perhaps she was over her illness. The baby died, however, at approximately 2:30 p.m. on that day.

The cause of the child's death was an extremely severe case of pneumonia which, according to the deputy coroner of Larimer County, had progressed over a considerable period of time. Expert medical witnesses called by the prosecution testified that symptoms of pneumonia included the following: poor feeding ability, difficulty in breathing, weakness, and blueness around the fingernails. One of these physicians testified that the baby would have survived if she had received treatment on Saturday, March 13, that she would have had slightly better than a 50% chance of recovery if treated on or before 5:00 p.m. on Sunday, and that she would have had some chance of recovery if treated a few hours before her death. Although conceding in his trial testimony that he knew Jessica was ill, the defendant testified that he did not believe the child had reached the point where she could be considered seriously sick or in urgent need of medical treatment.

At the conclusion of the evidence, the court denied the defendant's motion for a judgment of acquittal. The defendant then tendered jury instructions stating that the evidence in this case raised the affirmative defense of good faith treatment "solely by spiritual means through prayer," that a child who is under such treatment "shall [not], for that reason alone, be considered to be abused or endangered as to its health," and that the prosecution had the burden of proving beyond a reasonable doubt the guilt of the defendant as to the affirmative defense as well as all the elements of the crime charged. The court refused the defendant's tendered instructions and, consistent with its pretrial ruling, declined to give any jury instruction on the prayer defense. Over the defendant's objection, the court ruled that the phrase "without justifiable excuse" in section 18–6–401(1), 8 C.R.S. (1984 Supp.), would be deleted from the elemental instruction on child abuse. As a result, the jury was instructed that the elements of child abuse were as follows:

(1) Recklessly or through criminal negligence,

(2) Causing or permitting a child to be placed in a situation that may endanger the child's life or health, and

(3) The death of the child results.[6]

The jury returned a guilty verdict, and, after denying the defendant's motion for a new trial, the court sentenced the defendant to a probationary term of six years. This appeal followed.

## II.

We first address the defendant's contention that the trial court committed reversible error in striking down on its own motion the affirmative defense to child abuse contained in sections 18–6–401(6) and 19–1–114, 8 C.R.S. (1978). The defendant argues that, because neither the defense nor the prosecution raised the facial unconstitutionality of these statutes, the trial court lacked jurisdiction to declare the statutory prayer defense violative of the constitutional prohibition against legislation respecting

---

6. In a separate instruction, given over the defendant's objection, the jury was instructed as follows:

The statutes of this state:

1) Impose a duty that a parent shall not willfully fail, refuse, or neglect to provide proper care for his or her children.

2) Impose a duty upon a parent to provide proper medical care or any other care necessary for his or her child's health or well-being.

the establishment of religion, U.S. Const. amend. I and Colo. Const. art. II, § 4, and thus unavailable to the defendant in the instant prosecution. Although we decline to base our decision on a jurisdictional footing, we are satisfied that the trial court's ruling represented an impermissible exercise of judicial authority.

■ Axiomatic to the exercise of judicial authority is the principle that a court should not decide a constitutional issue unless and until such issue is actually raised by a party to the controversy and the necessity for such decision is clear and inescapable. *E.g., Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969); *Aircraft & Diesel Equipment Corp. v. Hirsch,* 331 U.S. 752, 763, 67 S.Ct. 1493, 1498, 91 L.Ed. 1796 (1947); *People v. Enea,* 665 P.2d 1026, 1028 (Colo.1983). Courts exist for the purpose of deciding live disputes involving " 'flesh-and-blood' legal problems with data 'relevant and adequate to an informed judgment.' " *New York v. Ferber,* 458 U.S. 747, 767–68, 102 S.Ct. 3348, 3359–3361, 73 L.Ed.2d 1113 (1982) (footnotes omitted). Requiring a court to restrict its decision to those claims raised by the parties in the specific controversy enhances the prospect that any final judgment will proceed from a factual and legal analysis of the actual dispute presented to the court. Without such salutary restrictions on the exercise of judicial authority, judicial pronouncements become nothing more than hypothetical rulings on matters extraneous to the real source of contention between the parties. *See, e.g., Beacom v. Board of County Commissioners,* 657 P.2d 440 (Colo.1983); *People v. Campbell,* 196 Colo. 390, 589 P.2d 1360 (1978). These guidelines are particularly appropriate to our disposition of this case.

■ Here, the parties raised disparate claims regarding the applicability of the statutory prayer defense to the case. The claim of the defendant was one of unconstitutional application—that is, if the limiting language of section 19–1–114 relating to spiritual treatment conducted "in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof" were to be applied so as to deny him the benefit of the prayer defense, then he would be denied his right to freely practice his religion in violation of the Free Exercise Clause of the First Amendment. The prosecution, on the other hand, sought a ruling that the statutory defense was not applicable to the facts on which the charge was based. The trial court thus had before it several options: it could have ruled on the defendant's request not to apply the limiting provisions of section 19–1–114 so as to deprive him of the prayer defense; it could have ruled that the affirmative defense was not applicable to the facts of this case; or, finally, it could have deferred ruling on the issue until the conclusion of the evidentiary phase of the trial. The court, however, rejected these options and ruled *sua sponte* that the entire statutory scheme was facially unconstitutional in violation of the Establishment Clause of the United States and Colorado Constitutions. U.S. Const. amend. I; Colo. Const. art. II, § 4.

The court's ruling, in addition to resolving a constitutional question not raised by any party to the litigation, deprived the defendant of any opportunity to present evidence at trial that might have entitled him to an appropriate jury instruction on the statutory defense created by section 18–6–401(6), 8 C.R.S. (1978).[7] In view of

7. The People, relying upon *Howell v. Woodlin School District R–104,* 198 Colo. 40, 596 P.2d 56 (1979), argue that the trial court acted within its discretion in ruling on the facial constitutionality of the statutory prayer defense because the constitutionality of that defense was implicitly involved in the resolution of the case. We find the People's reliance upon *Howell* misplaced and their argument unpersuasive. In *Howell,* a

teacher sought judicial review of a school district's decision to cancel his contract without a hearing. The district court ruled that section 22–63–112(3), 9 C.R.S. (1973), violated due process of law because it permitted a nonrenewal without providing a hearing. This court held that the district court permissibly addressed the constitutional issue because, although not expressly raised by the teacher, it was nonetheless

the gratuitous nature of the trial court's ruling on facial unconstitutionality, we deem it inappropriate for us to engage in an analysis of the correctness of that ruling, inasmuch as the issue of facial unconstitutionality was not raised before the trial court in the first instance. We thus limit our relief in this case to a reversal of the judgment of conviction and a remand for a new trial. Upon remand, the trial court should limit itself to a consideration of the issues raised by the parties.

### III.

Because the question will most likely arise on retrial, we consider the defendant's claim that the trial court improperly deleted the phrase "without justifiable excuse" from the elemental instruction on child abuse resulting in death. We find no error in the trial court's ruling.

■ Section 18–6–401(1)(a), 8 C.R.S. (1984 Supp.), as pertinent here, states that a person commits child abuse if he recklessly, or through criminal negligence, and without justifiable excuse, causes or permits a child to be placed in a situation that endangers the child's life or health. We held in *People v. Hoehl*, 193 Colo. 557, 561, 568 P.2d 484, 487 (1977), that the phrase "without justifiable excuse" refers to the affirmative defense contained in section 18–1–703(1)(a), 8 C.R.S. (1978), which states:

(1) The use of physical force upon another person which would otherwise constitute an offense is justifiable and not criminal under any of the following circumstances:

(a) A parent, guardian, or other person entrusted with the care and supervision of a minor or an incompetent person, and a teacher or other person entrusted with the care and supervision of a minor, may use reasonable and appropriate physical

force upon the minor or incompetent person when and to the extent it is reasonably necessary and appropriate to maintain discipline or promote the welfare of the minor or incompetent person.

*See People v. Jennings*, 641 P.2d 276 (Colo. 1982); *People v. Taggart*, 621 P.2d 1375 (Colo.1981); CJI–Crim. 22(8) (1983). There was no evidence in this case to support the statutory defense of reasonable and appropriate discipline, nor did the defendant rely on such defense during the trial. To have included the phrase "without justifiable excuse" in the elemental instruction on the crime of child abuse resulting in death would have injected an extraneous element which was both unsupported by the evidence and a source of likely confusion to the jury.[8]

### IV.

■ We conclude by considering the defendant's claim that the evidence was insufficient to support the guilty verdict to child abuse resulting in death. It is necessary that we address this issue because if the evidence is insufficient to support the conviction, the retrial of the defendant on the same charge would constitute a violation of the constitutional guarantee against double jeopardy. U.S. Const. amends. V and XIV; Colo. Const. art. II, § 18. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *People v. Brassfield*, 652 P.2d 588 (Colo.1982); *People v. Rutt*, 179 Colo. 180, 500 P.2d 362 (1972); *Hervey v. People*, 178 Colo. 38, 495 P.2d 204 (1972). In resolving the defendant's claim we must consider all the evidence, including that presented by the defendant, and evaluate this evidence in a light most favorable to the People and then determine whether, when so considered, the evidence is of sufficient quality and quantity to support a conclusion by a reasonable person that the

---

implicitly involved in the proper determination of the case. In the instant case, however, the facial constitutionality of the statutory prayer defense was simply not implicated in the issues raised before the trial court. The trial court, therefore, improperly decided that issue.

8. To the extent that the statutory prayer defense of sections 18–6–401(6) and 19–1–114, 8 C.R.S. (1978), might be applicable on retrial, the trial court should fashion separate instructions on that defense independently of and without reference to the "without justifiable excuse" language in section 18–6–401(1), 8 C.R.S. (1984 Supp.).

defendant's guilt has been established beyond a reasonable doubt. *E.g., People v. Gonzales*, 666 P.2d 123 (Colo.1983); *People v. Olinger*, 180 Colo. 58, 502 P.2d 79 (1972); *Silcott v. People*, 176 Colo. 442, 492 P.2d 70 (1971). We are satisfied that the record, when viewed under the appropriate standard, contains sufficient evidence to permit a retrial of the defendant.

The crime charged in this case required proof beyond a reasonable doubt that the defendant recklessly or through criminal negligence caused or permitted his child to be placed in a situation that endangered the child's life or health and that the death of the child thereby resulted. Reckless conduct involves a conscious disregard of a substantial and unjustifiable risk that a result will occur or that a circumstance exists. § 18–1–501(8), 8 C.R.S. (1978). A person acts with criminal negligence when, through a gross deviation from the standard of care that a reasonable person would exercise, he fails to perceive a substantial and unjustifiable risk that a result will occur or that a circumstance exists. § 18–1–501(3), 8 C.R.S. (1978).

There was evidence in this case establishing that the child, during the two day period prior to her death, manifested symptoms of serious physical illness and that, notwithstanding the contrary urgings of Mr. and Mrs. McGillicuddy, the defendant chose to forego medical treatment for the child. Indeed, the defendant acknowledged in his trial testimony that he was aware of the child's difficulty in breathing, serious congestion, and debilitating condition. Under these circumstances a reasonable person could conclude beyond a reasonable doubt that the defendant consciously disregarded a substantial and unjustifiable risk of death to his child, or, at the very least, grossly deviated from a standard of reasonable care in failing to perceive the child's deteriorating condition and the need for immediate medical attention. There was thus sufficient evidence presented at trial to withstand the defendant's motion for a judgment of acquittal and to permit his retrial upon remand.

The judgment is reversed and the cause is remanded for a new trial.