22CA1870 Peo v Starr 04-03-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1870
El Paso County District Court No. 21CR4943
Honorable Frances R. Johnson, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Joshua Thomas Starr,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE JOHNSON
Lipinsky and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 3, 2025

Philip J. Weiser, Attorney General, Jessica E. Ross, Senior Assistant Attorney
General & Assistant Solicitor General, Jacey DeHoyos, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Leah Scaduto, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Joshua Thomas Starr (Starr), appeals his judgment of conviction entered on jury verdicts finding him guilty of two counts of second degree assault (strangulation / substantial bodily injury), third degree assault, and harassment.

¶ 2     On appeal, Starr contends that his convictions should be reversed because the district court erred by (1) admitting the victim's statements to two people in violation of CRE 803(3) and 803(4); (2) admitting the victim's statements to medical staff in violation of his Confrontation Clause rights; (3) failing to provide the jury with his self-induced intoxication instruction; and (4) allowing the prosecutor to engage in misconduct.  He also alleges cumulative error.

¶ 3     We conclude that the district court erred by admitting, under the medical diagnosis and treatment exception to the hearsay rule, CRE 803(4), the victim's statement to a forensic nurse examiner (also known as a sexual assault nurse examiner or SANE) identifying her assailant by name.  And we conclude that the district court's admission of the victim's statement was not harmless.

¶ 4    Because Starr's other contentions are unlikely to arise in the same manner on remand, if they arise at all, we need not address them. Accordingly, we reverse Starr's judgment of conviction and remand the case to the district court for a new trial.

## I.    Background

¶ 5    One night around midnight, Julius Watson (Watson) was walking home after work when he saw the victim, R.F., crying on the sidewalk. R.F.'s face was swollen, and she had blood on her cheek and neck. She asked Watson if she could use his cellphone. Watson asked her if she was okay. R.F. told Watson that her boyfriend "beat her up." Watson then helped R.F. to his apartment to call the police.

¶ 6    Officer Cindy Schneider (Officer Schneider) from the Manitou Police Department was the primary investigator of the assault. Officer Levi Hoover (Officer Hoover) accompanied Officer Schneider and assisted with the investigation. At trial, Officer Hoover testified that he had learned through Officer Schneider that R.F. and the suspect lived a few blocks away from where Watson had encountered R.F. R.F. went to a hospital.

¶ 7    At the hospital, several medical professionals spoke with R.F., but most relevant to Starr's appeal, she was treated by physician assistant Aaron Constantino (Constantino) and a SANE, Erin Ropelewski (Ropelewski). R.F. reported to Ropelewski that her boyfriend had strangled her and punched her in the face; and told her, "I want to die, and if I die, you are going to die with me." Ropelewski testified at trial that R.F.'s face was swollen, she had bruising and red marks all around her body, and she had a fractured rib.

¶ 8    In the meantime, Officers Schneider and Hoover attempted to contact R.F.'s boyfriend at the address R.F. had provided. They knocked on the apartment door several times, but no one answered. Office Schneider went to the hospital to obtain a better statement from R.F. Later in the early morning, Officer Schneider or dispatch had learned from R.F. (and possibly from R.F.'s mother) that R.F.'s boyfriend was at the apartment they had visited earlier. The officers returned there.

¶ 9    At the apartment, they discovered significant blood splatter on the carpet and staircase leading to the apartment door and blood throughout the apartment, including on the back of the front door

3

and a living room couch. While inside, the officers found a man, who turned out to be Starr, with scratches all over his arms and blood on his hands and shorts. The officers took photos of the apartment and Starr. Starr made statements to the officers.

¶ 10 The prosecution charged Starr with two counts of second degree assault, third degree assault, and harassment, each as an act of domestic violence. Before trial, the court granted Starr's motion to suppress his statements to the officers, reasoning that the officers had improperly interrogated him while he was in custody without advising him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 11 Neither R.F. nor Officer Schneider appeared at trial. Because R.F. was not present at trial, the prosecution sought to prove the facts underlying R.F.'s assault through Watson, Officer Hoover, Ropelewski, Constantino, and R.F.'s medical records. Although Officer Hoover described his observations at the apartment and Starr's demeanor at the time, none of Starr's statements, including Starr identifying himself to the officers, were admitted due to the court's suppression ruling.

¶ 12    The prosecution attempted to prove that Starr was R.F.'s assailant through Ropelewski's testimony and R.F.'s medical records. The court admitted most of the medical records, identified as Exhibit 39. Even though the parties agreed that certain parts of the medical records needed to be redacted before they were admitted into evidence, the redaction did not occur.

¶ 13    The jury convicted Starr as charged. The district court sentenced him to twenty-four months of probation.

## II.    CRE 803(4) Objections

¶ 14    Starr asserts that Ropelewski's and Constantino's testimony and R.F.'s medical records were inadmissible hearsay, as they did not fall within the medical diagnosis exception to hearsay, CRE 803(4).

### A.    Additional Facts

¶ 15    At the hospital, Ropelewski performed a sexual assault examination on R.F., which included, among other things, R.F.'s statement of the events resulting in her injuries and visit to the hospital; a consent form signed by R.F. giving Ropelewski permission to report the incident to law enforcement; various

5

assessments, such as danger, safety, and fall-risk assessments; and a psychosocial report.

¶ 16    During Constantino's and Ropelewski's testimony, but mostly the latter, the court admitted over the objections of defense counsel statements R.F. made to Ropelewski, as documented in the medical records. The testimony, to which defense counsel objected, included the following information:

- the date, time, and location of the assault;

- the name of R.F.'s assailant and his relationship to her;

- R.F.'s signature authorizing information to be released to law enforcement;

- R.F.'s home situation, as found on the psychosocial report;

- R.F.'s relationship with Starr and Starr's alcohol use;

- a verbatim narrative detailing R.F.'s allegations of what occurred before and during the assault and her allegation that Starr was under the influence of drugs at the time;

- R.F.'s references, repeated throughout the medical records, that her boyfriend physically "assaulted" and "strangled" her;

6

- her statements given as part of the danger assessment, which also included the medical professionals' evaluation of the likelihood that Starr would kill R.F.;

- R.F.'s statements expressing her feelings of safety in the home, which included her fear of Starr;

- her description of the manner in which she was strangled, the pressure applied, the number of times she was strangled, and her reported symptoms;

- the statements that R.F. made about her symptoms to the initial providers while describing the assault; and

- her statement that she had not fallen in the last three months.

¶ 17 Defense counsel further objected to Constantino's testimony regarding such information as

- the medical professionals' certification that R.F. had suffered a serious bodily injury, as documented in Exhibit 40; and

- R.F.'s statements that she was "assaulted by her boyfriend," she was "struck multiple times about the face and also experienced a strangulation injury although she does not

7

believe she lost consciousness," and she was experiencing "facial pain and swelling."

¶ 18    In overruling most of the objections, the district court applied *People v. Allee*, 77 P.3d 831, 834 (Colo. App. 2003), finding that the prosecution had laid a sufficient foundation for admission of the statements under the medical diagnosis and treatment exception to the hearsay rule. The court found that (1) R.F.'s motives for making the statements were to promote medical treatment and diagnosis; and (2) the medical professionals reasonably relied on her statements in diagnosing R.F. and treating her. The court, however, sustained Starr's objections to the testimony about the danger assessment and safety screenings, and in response, the prosecutor agreed to redact those portions of Exhibit 39. But based on our review of the record, that exhibit was not redacted.

B.    Standard of Review and Applicable Law

¶ 19    We review the district court's evidentiary decisions for abuse of discretion. *See People v. Gonzales–Quevedo*, 203 P.3d 609, 612 (Colo. App. 2008).

¶ 20    "Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in

8

evidence to prove the truth of the matter asserted." CRE 801(c).

Such statements are presumptively unreliable because the

declarant is not present to explain the statement in context and to

be cross-examined. *Blecha v. People*, 962 P.2d 931, 937 (Colo.

1998). Due to their presumptive unreliability, hearsay statements

generally are not admissible. *Id.*; *see* CRE 802. But a statement is

not hearsay if it is not offered for the truth of the matter asserted.

*See People v. Cohen*, 2019 COA 38, ¶ 12.

¶ 21     A hearsay statement may still be admitted, however, if it falls

within a hearsay exception. *See People v. Blecha*, 940 P.2d 1070,

1074 (Colo. App. 1996), *aff'd*, 962 P.2d 931 (Colo. 1998). "The

burden of establishing the preliminary facts to establish the

hearsay exception is on the proponent of the evidence." *People v.*

*Garcia*, 826 P.2d 1259, 1264 (Colo. 1992).

¶ 22     A hearsay statement is admissible under CRE 803(4) if it is

"made for purposes of medical diagnosis or treatment and

describ[es] medical history, or past or present symptoms, pain, or

sensations, or the inception or general character of the cause or

external source thereof insofar as reasonably pertinent to diagnosis

or treatment." CRE 803(4); *see also Kelly v. Haralampopoulos*, 2014

CO 46, ¶ 20; *People v. Tyme*, 2013 COA 59, ¶ 16; *King v. People*, 785 P.2d, 596, 600 (Colo. 1990). The rule's rationale is that statements made to a physician or medical professional are presumptively reliable because the patient believes that the "effectiveness of the treatment . . . may depend largely upon the accuracy of the information provided to the physician." *People v. Jaramillo*, 183 P.3d 665, 669 (Colo. App. 2008); *W.C.L. v. People*, 685 P.2d 176, 181 (Colo. 1984); *People v. Galloway*, 726 P.2d 249, 252 (Colo. App. 1986).

### C.    Medical Diagnosis/Treatment - Identity

¶ 23    Starr makes six arguments in support of his contention that the court erred by admitting the medical professionals' testimony and the medical records: (1) the court did not parse out R.F.'s statements but rather admitted the medical records wholesale, except, as mentioned above, the danger and safety screenings; (2) many of R.F.'s statements to Ropelewski, especially the narrative about the assault, were not "necessary" for Ropelewski to treat R.F., as R.F. had already discussed her injuries with other medical professionals; (3) R.F. did not identify her assailant for a medical purpose and, thus, the identification was unnecessary for the

medical professionals to diagnose and treat her; (4) R.F.'s consent to disclosure of the medical records and Officer Schneider's presence at the hospital, and possibly in the room during the exam, made R.F.'s statements more investigatory than for medical purposes; (5) R.F.'s statements about her injuries for the strangulation exam were unnecessary because imaging and diagnosis of R.F.'s injuries were underway before Ropelewski's exam; and (6) the medical records were replete with R.F.'s statements made to other medical professionals.

¶ 24 We agree with Starr on his third contention — the identity of R.F.'s assailant was unnecessary for medical diagnosis and treatment and, therefore, was inadmissible hearsay under CRE 803(4). We also conclude that the error was not harmless and, thus, we reverse his judgment of conviction.

¶ 25 Like the district court, the Attorney General relies on *Allee*, 77 P.3d at 834, to argue that the assailant's identity has a medical purpose because it assists with determining whether the victim might need resources. The Attorney General further argues that, unlike in *Allee*, the record shows that R.F. was provided with a packet of domestic violence resources at the hospital.

¶ 26    *Allee* held that the identity of a victim's assailant generally does not serve a medical purpose.  But the division recognized that an exception exists if a "portion of the statement is itself perceived by the medical provider as necessary for diagnosis and treatment." *Id.*  The division determined that the record in that case did not "indicate that the identification of defendant as the victim's assailant was necessary for or pertinent to the physician's diagnosis or treatment or that he made any referral to domestic abuse resources or took any other action based on that identification."  *Id.* Even though the division concluded in *Allee* that the court erred, it also determined that the error was harmless.  This was because the physician's identification of the assailant was cumulative of testimony given by the investigating officers, whose testimony the defendant had not challenged.  *Id.* at 835; *see also Jaramillo*, 183 P.3d at 669 (holding that, while testimony of the victim's identity of her assailant through the nurse practitioner was error, it was harmless because it was cumulative of testimony provided by the victim and the investigating officer's testimony).

¶ 27    Like the divisions in *Allee* and *Jaramillo*, we agree that identification of the victim's assailant may in certain cases further

12

medical diagnosis and treatment purposes and, thus, be admissible under CRE 803(4). But in this case, we do not see how R.F.'s identification of her assailant advanced any medical purpose. It was appropriate for Ropelewski to ask R.F. about the events leading to her injuries to assist with medical diagnosis and treatment, one aspect being that R.F. would be safe and was not returning to a potentially dangerous situation.

¶ 28 Ropelewski knew that R.F.'s assailant was her boyfriend with whom she lived in an apartment. Based on this information, Ropelewski was able to set up a safety plan that ensured R.F. did not return to the apartment, as Ropelewski knew that R.F. was going home with her mother upon discharge. Ropelewski was also able to provide R.F. with domestic violence resources.

¶ 29 Missing, though, and critical to our analysis, is any explanation from Ropelewski, in her testimony or in her medical notes, about *why* learning the identity of the assailant was necessary to further these two objectives. Simply because a victim identifies her assailant to a SANE or other medical personnel does not automatically transform that statement into one for medical treatment or diagnosis. Without more explanation from Ropelewski

as to why the assailant's identity was necessary to medically treat R.F., we conclude that the identity of the R.F.'s assailant by name was inadmissible hearsay under CRE 803(4). *See People v. Vigil*, 127 P.3d 916, 924 (Colo. 2006) (Although dealing with whether a child's statements to a SANE were testimonial for purposes of the Confrontation Clause, the supreme court upheld the district court's exclusion of the child's statement of the assailant by name under CRE 803(4) "because the identity of the male who penetrated the child was immaterial to the doctor's opinion.").

¶ 30      Although not dispositive, relevant to our inquiry, is that the police were present at the hospital, appeared at times to be in the examination room with R.F., and returned to the hospital to obtain more information from R.F. about the whereabouts of R.F.'s boyfriend after officers failed to make contact with him at the apartment. *See Tyme*, ¶ 17 (noting that, "[w]here the facts and circumstances surrounding the statements give rise to an inference that the forensic examination or interview had no medical or diagnostic characteristic, but was rather purely investigative, the statements may not be considered trustworthy and thus may not be admissible"). Under these circumstances, and in the absence of

testimony from Ropelewski as to what medical purpose was served

by R.F.'s identification of her assailant by name, we conclude the

court erred by admitting the references to Starr's identity in R.F.'s

medical records.[1]

---

[1] Starr also challenged R.F.'s statements identifying her assailant by name to Ropelewski as testimonial statements implicating the Confrontation Clause. Because we have already determined the court erred by admitting R.F.'s statements under CRE 803(4), we do not address Starr's Confrontation Clause arguments based on the doctrine of constitutional avoidance. *See People v. Lybarger*, 700 P.2d 910, 915 (Colo. 1985) ("Axiomatic to the exercise of judicial authority is the principle that a court should not decide a constitutional issue unless and until such issue is actually raised by a party to the controversy and the necessity for such decision is clear and inescapable.").

    We acknowledge, however, that the analysis under CRE 803(4) is similar, in part, to the analysis of whether a declarant's "primary purpose" in making a statement implicates the Confrontation Clause. Statements are testimonial for Confrontation Clause purposes "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Ohio v. Clark*, 576 U.S. 237, 244 (2015) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)); *see also People v. Phillips*, 2012 COA 176, ¶ 114 (quoting *Michigan v. Bryant*, 562 U.S. 344, 366 (2011)). Despite any similarity in the analytical frameworks, though, we point to the police presence at the hospital and the police investigation to support our CRE 803(4) analysis that Starr's identity had no medical diagnosis or treatment purpose. As a result, we take no position on what R.F.'s "primary purpose" was when she identified Starr by name.

## D. The Error is not Harmless

¶ 31    Because Starr objected to the court's admission of Starr's identification through R.F.'s medical records, we review under nonconstitutional harmless error. "Under this standard, reversal is required only if the error affects the substantial rights of the parties." *Hagos v. People*, 2012 CO 63, ¶ 12; *see also* Crim. P. 52(a). This means that reversal is required only when "the error substantially influenced the verdict or affected the fairness of the trial proceedings." *People v. Tevlin*, 715 P.2d 338, 342 (Colo. 1986).

¶ 32    We conclude for three reasons that the error was not harmless.

¶ 33    First, R.F.'s statement to Ropelewski that her boyfriend — whom R.F. identified as Starr according to her medical records — assaulted her was the only direct evidence linking Starr to the

16

assault.  As mentioned previously, R.F. and Officer Schneider were not present at trial to testify.[2]

¶ 34    After R.F. was able to escape her apartment, she encountered Watson, who helped her call police.  Although R.F. told Watson she had been beaten up by her boyfriend, Watson never testified that R.F. told him her boyfriend's name.  The record does not reflect the content of R.F.'s 911 call, nor was the content of the call introduced into evidence at trial, so we do not know what R.F said to the 911 operator.  Although Officer Hoover testified about parts of his investigation, Officer Schneider was the primary officer who spoke with R.F.  Because Officer Schneider did not testify at trial, none of R.F.'s statements to the police were admitted into evidence.  Likewise, Officer Schneider wrote a report that might have identified

---

[2] We acknowledge that it is immaterial whether the declarant is available for purposes of the medical and diagnosis exception to hearsay exception, CRE 803(4).  Regardless, the prosecutor had no explanation why Officer Schneider was not under subpoena to testify.  And as to R.F., the prosecutor indicated that, although R.F. had been cooperating, he did not serve her with a subpoena because his process server was sick.  But the prosecutor did not explain why he could not have retained another process server or claim that he was unable to serve R.F. because he did not know her address or because of some other unforeseen challenge.

17

Starr as R.F.'s assailant, but the report was not admitted into evidence.

¶ 35 And Officer Hoover's testimony was limited, given he was not the primary investigating officer and because the court suppressed Starr's statements made to him at the apartment. Officer Hoover testified, "I don't believe I spoke to [R.F.], that was my partner that spoke with her. I was just on scene." Therefore, his testimony was limited to his collection of evidence at the apartment, including photographing Starr. And Officer Hoover did not testify that Starr identified himself as R.F.'s boyfriend or that Starr admitted he lived in the apartment. Because of the district court's suppression ruling, defense counsel objected at trial when the prosecutor attempted to question Officer Hoover about any statements Starr might have made at the apartment.

¶ 36 Officer Hoover identified Starr in court, but the officer's identification was nothing more than a statement that Starr was the person he photographed at the apartment. Significantly, Officer Hoover did not testify that Starr was R.F.'s boyfriend, Starr lived with R.F., or Starr was the person who assaulted her.

¶ 37    The record indicates that the prosecution relied on R.F.'s statements to medical professionals identifying Starr to link him to the person in the apartment and to show that he was the person who assaulted her. When Starr sought a judgment of acquittal, the prosecutor relied heavily on his attempt to link the person who attacked R.F. to the person whom Officer Hoover had identified. The court recognized there was a missing link, however, saying, "Officer Hoover went to the residence, and he saw Mr. Starr. But beyond that, we don't have anything linking Mr. Starr as the perpetrator of [R.F.]'s injuries."

¶ 38    In response, the prosecutor referred to Ropelewski's notes identifying Starr:

> In part of [Ropelewski's] report on page 10, she discusses that . . . [R.F.] lives at [address] in Manitou Springs with her boyfriend, Joshua Starr. That is everything the Court needs to link the Joshua Starr that we have, whom the police identified as the person living at that very apartment, as the Joshua Starr that he is her boyfriend. She named him as the assailant. She named him as his — her boyfriend. She named him as living at that apartment.
>
> And all of that is tied to the officer showing up at the apartment, finding the very same Joshua Starr who he could point to and say,

yes, that is Joshua Starr, and finding all the evidence that the crime took place there. The Court has everything in terms of ID and relationship through what she told [Ropelewski], as well as the officer's investigations.

In denying the motion for judgment of acquittal, the court outlined the evidence:

[R.F.] left her apartment and said her boyfriend assaulted her. She was taken to the hospital but told law enforcement, this is the address where it happened and it was my boyfriend, Joshua Starr. Law enforcement goes there. He's not at that apartment, so they go back with her to the hospital. At the hospital, she tells [Ropelewski], it was my boyfriend, Joshua Starr. We live at this address together.

The court further said that, upon returning to the apartment, the officers found "the Joshua Starr who [R.F.] identified as her boyfriend there." The court denied the motion, concluding there was sufficient circumstantial evidence for the jury to link the defendant to the person who was R.F.'s boyfriend and who attacked her.

¶ 39     Although Starr does not appeal the court's denial of his motion for judgment of acquittal, we refer to that ruling to note that the court misstated the evidence. For example, no testimony in the

20

record indicates that R.F. told the police officers Starr's name or that her boyfriend lived with her. That information solely came from R.F.'s statement to Ropelewski, which Ropelewski repeated at trial. True, Officer Hoover testified that R.F. gave Officer Schneider her address, which is how the officers knew where she lived. But R.F.'s statements to Ropelewski documented in Exhibit 39 are necessary to make the connection between the boyfriend with whom R.F. lived and Starr.

¶ 40　R.F.'s statements to Ropelewski linking the individual whom the police found in the apartment to the person with the same last name who attacked R.F. were central to the prosecution's case, as the prosecutor's closing argument underscored. The prosecutor said in closing, R.F. "reported to [Ropelewski] that they lived together at the address . . . she reported where it happened, that Joshua Starr, this guy, was her boyfriend."

¶ 41　Defense counsel stressed during closing argument the importance of the fact that the police did not conduct an investigation or produce a report, and that R.F. was not present at trial, "because a large portion of the Government's case against Mr. Starr . . . was conducted . . . through the forensic nurse examiner

and not through Officer Schneider, who could have been here to tell you what happened." Defense counsel concluded by saying, "the Government's attempt at beyond a reasonable doubt in this case is to provide a backup officer and medical professionals to show what the results of the entire investigation [were] and what you may have heard from [R.F.]" Thus, R.F.'s statement to Ropelewski that Starr was the person who attacked her was the only evidence at trial that identified her attacker by name.

¶ 42 Second, the prosecution provided no corroborating evidence that Starr was the attacker. As mentioned above, the 911 call and Officer Schneider's report were not introduced into evidence. The prosecution presented no physical evidence, such as DNA, from R.F.'s clothing or blood found in the apartment, to link Starr to the assault. True, the prosecution introduced Officer Hoover's photographs of Starr that showed he had injuries consistent with being in an altercation. Starr's injuries were only relevant if his identity was ascertained, which again came in through R.F.'s hearsay-filled medical records.

¶ 43 Third, the prosecutor agreed to redact or remove the danger and safety assessments from Exhibit 39. The record only refers to

page 69 of Exhibit 39 and fails to mention the other pages encompassed by the court's redaction ruling. Our review of Exhibit 39 suggests that the danger/safety assessments are on pages 15-17, 48, and 57. Given the many redactions that should have been made to the exhibit, in addition to the redaction of Starr's name, we conclude the error was not harmless. Therefore, we reverse Starr's convictions.

## III. Conclusion

¶ 44 We reverse Starr's judgment of conviction and remand the case to the district court for a new trial.

JUDGE LIPINSKY and JUDGE MOULTRIE concur.